# CONTINUATION IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE

## INTRODUCTION AND AGENT BACKGROUND

1. I make this Continuation in support of an application for a search warrant for information associated with the Facebook account 100007996304677 (Display Name: "Dustin Hill Billy Clark," User Name: dustin.clark.564), that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This Continuation is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with Facebook account 100007996304677.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the Lansing, Michigan, Field Office. I have been an ATF Special Agent since 2003. As such, I have investigated numerous violations of federal law, including violations that have involved the use of computers and the internet. Prior to becoming a Special Agent, I worked at the ATF laboratory in Ammendale, Maryland, for a year and a half as an Integrated Ballistics Identification System (IBIS) Specialist. I have a Bachelor's Degree in Sociology from the University of Michigan, and I have completed the Federal Law Enforcement Training Center Criminal Investigators program, the ATF New Professional Training for Special

Agents program, and the ATF Advanced Interstate Nexus of Firearms and Ammunition course.  I have also received training in social media and its use in crime.  I have investigated numerous violations of federal law, including violations that have involved the use of computers and the internet.

3.      The facts in this Continuation come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.  This Continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this Continuation, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) (possession of a firearm by a felon) and 26 U.S.C. § 5861(d) (possession of an unregistered destructive device) have been committed by Dustin D. Clark.  There is probable cause to believe that the service of a search warrant on the Facebook account listed above will lead to evidence, fruits, and instrumentalities of the aforementioned crimes, as well as the identification of individuals who are engaged in the commission of those and related crimes.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## RELEVANT STATUTES

5. Title 18, United States Code, Section 922(g)(1) prohibits a person who has been convicted of a crime punishable by imprisonment for a term exceeding one year to possess any firearm or ammunition in or affecting interstate commerce.

6. Title 28, United States Code, Section 5861(d) prohibits anyone from possessing a firearm that is not registered to him in the National Firearms Registration and Transfer Record. The National Firearms Registration and Transfer Record requires the registration of destructive devices, which are defined to include "any explosive, incendiary, or poison gas (A) bomb [or] (B) grenade." 26 U.S.C. § 5845(f).

## PROBABLE CAUSE

7. On August 22, 2017, the Ingham County Sheriff Office Delhi Division Office received a walk in complaint from Witness 1[1] regarding some suspicious items that were left at her trailer. She showed the deputy photographs of what appeared to be two bombs. Witness 1 stated that she found them on her dresser in her bedroom when she woke up. She stated the bombs were left there by Dustin CLARK who had been staying at her trailer for the past two months. Witness 1 lives with her boyfriend; CLARK is a friend of her boyfriend. She said that CLARK keeps a few belongings in the bedroom that she shares with her boyfriend.

---

[1] The name of Witness 1 is known to me, but is not used to protect her identity and privacy.

She stated that in a dresser drawer she also located what appeared to be two guns, a knife, ammunition and possibly a mask.

8. Witness 1 signed a Consent to Search form for her residence and the Ingham County Sheriff and the Michigan State Police (MSP) Bomb Squad responded to Witness 1's trailer in Holt, MI. The MSP Bomb Squad entered the residence and rendered the two suspected Improvised Explosive Devices (IEDs) safe. The Ingham County Sheriff Office then searched the residence after the Bomb Squad left. They located a loaded .380 caliber pistol in a holster, a BB gun, two large knives, a piece of mail addressed to Dustin CLARK, a mask, a container of BBs, and a box of .380 ammunition.

9. During an additional interview with Witness 1, she explained that CLARK does not have a bedroom at the residence and that he sleeps on the couch. Last night CLARK came in around 4:00am. She and her boyfriend were asleep in the living room because the air conditioner was not working in the bedroom. CLARK came and went into the bedroom. He was at the residence a short time and then left for work. Witness 1 stated that CLARK does keep a few clothing items in the master bedroom, but he does not sleep in there. When she went into the bedroom later that morning to get some clothing from the dresser drawer, she noticed the homemade bombs on top of the dresser; she then opened the middle drawer to retrieve some of her clothes and noticed that her clothes had been moved. Where her clothes used to be, she found the above seized items all in the same drawer. She stated that she had known CLARK for about two years, but that her

4

boyfriend and CLARK grew up together in that same trailer park. She was asked where CLARK might be and she said that he was working a flooring job for some man in East Lansing. She said that until recently he used to come around on a regular basis and eat dinner with them and hang out. Then when he started working his current job he started having erratic hours and arriving at the trailer in the middle of the night. She said he did not have a vehicle or a phone number and that he only communicated over Wi-Fi on his phone via Facebook Messenger.

      10.    On August 22, 2017, I was asked to assist in this case because of the firearm and suspected explosive devices located at the residence. I checked the serial number of the .380 caliber firearm recovered and saw that it was last registered to Witness 2[2], Dustin's father, on Gunn Rd in Holt. At approximately 3:00pm, myself and ATF Task Force Officer Norm Naimy went to speak to Witness 2 about the firearm. I asked Witness 2 if he owned a .380 caliber pistol. He said he did and said it should be in a safe he has in the house. I asked him what manufacturer it was and he said he thought it was Hungarian. The firearm seized from the trailer was an FEG, made in Hungary .380 caliber pistol. I and TFO Naimy followed Witness 2 into his residence. He went to the area where he kept the firearm and picked up the case it was stored in, but quickly realized it was empty. He said that his son Dustin CLARK had been to the house in the middle of July when he was out of town. His other son was present when CLARK came by

---

[2] The name of Witness 2 is known to me but is not used to protect his identity and privacy.

and at that time Witness 2 gave him permission to hang out at the house. When Witness 2 returned home, he realized that Dustin stole over $100 from him. He later confronted him about the money and CLARK admitted he took it. Witness 2 thinks that Dustin might have stolen the firearm during that same time. Witness 2 had not really looked at the firearm for almost a year since he had newer guns he looked at more often. I also asked Witness 2 if he had any boxes of .380 caliber ammunition. He said yes. I asked what brand it was and he said it had the red box. I stated that a box of American Eagle .380 ammunition was located with the firearm and he said that Dustin most likely took that from him too.

  11. I told Witness 2 that the firearm was located with two suspected explosive devices at a trailer in Holt where his son was staying. Witness 2 said that CLARK had not lived at his house since he was 15 and that he has had some trouble in the past couple years. Witness 2 said that his son frequently posts on Facebook. Witness 2 said CLARK does not have a phone number so Witness 2 uses Facebook Instant Messenger to communicate with CLARK. He said a short time ago, CLARK posted a picture of himself holding what looked to be a bomb in his hand and he wrote the caption "I made a bomb". Witness 2 said it did not look like a real bomb so he dismissed the posting. I asked him if he still had the photo and he said he might. He attempted to locate the photo from CLARK's Facebook page, but did not see it. I showed Witness 2 a picture of one of the devices retrieved earlier by the bomb squad. Witness 2 said it looked similar to the one he saw, but the one in the photo he saw did not have any red writing on it. I asked him when

the last time he heard from his son was and he said earlier that morning CLARK told him he was working a job in East Lansing and Witness 2 showed me some Facebook messages that he received from CLARK.

12. On August 23, 2017, Det. Lewis with the Ingham County Sheriff Office interviewed Witness 3[3], who lived in the trailer with Witness 1. He stated that he has known CLARK for approximately 10 years. He was upset that CLARK would leave IEDs at his trailer. He said he briefly had contact with CLARK after the incident via Facebook Messenger. CLARK accused him of calling the cops on him and said the bombs were just fireworks.

13. On August 23, a Facebook friend of CLARK's called the Sheriff's Office after seeing the news the night before about a bomb being located in a trailer in Holt. The caller stated that this morning they were looking through their Facebook feeds and saw that Dustin CLARK had posted a link to the news article on CLARK's page. CLARK's post:

---

[3] The name of Witness 3 is known to me but is not used to protect his privacy and identity.



14.     A preservation request was sent to Facebook for the following account on August 22, 2017, 100007996304677 (Display Name: "Dustin Hill Billy Clark"; Username: dustin.clark.564).  As of August 23, 2017, SA Wallace was able to access the account, indicating that their contents had not been deleted at the time the preservation request was made.

15.     As of August 23, 2017, the account for Dustin Hill Billy Clark (100007996304677) was still accessible and content had been added the same day.

16.     On or about January 22, 2016, Dustin CLARK was found guilty of Weapons-Carrying Concealed, a felony, in the 56th Circuit Court in Eaton County

Michigan. He was initially placed on HYTA probation for the offense, but violated his probation terms and was subsequently convicted of the violation and his probation was revoked on March 16, 2017.

17. I inspected the firearm belonging to Witness 2 that was located in the trailer, a FEG, model APK, .380 caliber pistol determined, as an Interstate Firearm and Ammunition Nexus Expert, that it is a firearm under federal law and was not manufactured in Michigan and therefore affected interstate and/or foreign commerce.

## FACEBOOK BACKGROUND

18. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

19. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

20. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

21. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

22. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.

10

Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall" or "Timeline," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

23. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

24. Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition,

Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

25. If one Facebook user deletes private messages with another user, those messages may still be retained in the other user's account.

26. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

28. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

29. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

31. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

32. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

33. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

34. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall or Timeline postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member,

including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

35. Facebook also retains Internet Protocol ("IP") logs for a given User ID or IP address. These logs may contain information about the actions taken by the User ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the User ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

36. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

37. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and

how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook

15

account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

39. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B, dating from July 1, 2017 to the present for account 100007996304677 (Display Name: "Dustin Hill Billy Clark," User Name: dustin.clark.564).

40. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate items that will assist with the purpose of the warrant, described in Section II of Attachment B.

## CONCLUSION

41. Based on the forgoing, I request that the Court issue the proposed search warrant.

42. I am advised by the U.S. Attorney's Office that this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that— has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.